**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

ROBERT ACRE and MARGARET ACRE,                              PLAINTIFFS/
Husband and Wife; FRANCES SMITH, a single person;     COUNTER DEFENDANTS
RUSSELL ACRE and ANITA ACRE, husband and wife;
PAUL ACRE and DONNA ACRE, husband and wife;
JERRY PEARSON and MARGARET PEARSON, husband
and wife; and DONALD McINTOSH and DIANE McINTOSH,
husband and wife

v.                                  No. 4:09CV00421 JLH

                                                        DEFENDANT/COUNTER-
SPINDLETOP OIL & GAS COMPANY            CLAIMANT/THIRD PARTY PLAINTIFF

v.

CHESAPEAKE EXPLORATION LIMITED PARTNERSHIP
and CHESAPEAKE EXPLORATION, LLC                    THIRD PARTY DEFENDANTS

<u>**OPINION AND ORDER**</u>

The plaintiffs commenced this action against Spindletop Oil & Gas Company in the Circuit

Court of Faulkner County, Arkansas, seeking judicial cancellation of oil and gas leases.  The case

was removed to this Court on June 9, 2009, and Spindletop filed a counterclaim and third party

complaint against Chesapeake Exploration, LLC, on the same day.  After Spindletop amended its

third party complaint, Chesapeake filed a motion to dismiss the amended third party complaint.  The

Court then granted Spindletop's motion for leave to amend, and Spindletop filed a second amended

third party complaint, which Chesapeake has also moved to dismiss.  For the following reasons,

Chesapeake's motion to dismiss the second amended third party complaint is granted.

**I.**

In ruling on a Rule 12(b)(6) motion to dismiss, the court "accept[s] as true all of the factual

allegations contained in the complaint, and review[s] the complaint to determine whether its

allegations show that the pleader is entitled to relief."  *Schaaf v. Residential Funding Corp.*, 517 F.3d

544, 549 (8th Cir. 2008).  All reasonable inferences from the complaint must be drawn in favor of the nonmoving party.  *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004).  A motion to dismiss should not be granted merely because the complaint "does not state with precision all elements that give rise to a legal basis for recovery."  *Schmedding v. Tnemec Co.*, 187 F.3d 862, 864 (8th Cir. 1999).  A complaint need only contain "'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Id.* (quoting Fed. R. Civ. P. 8(a)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007) (citations omitted).  Stated differently, the plaintiff must "raise a right to relief above a speculative level."  *Schaaf*, 517 F.3d at 549.  "While the court must accept allegations of fact as true when considering a motion to dismiss, the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."  *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002); *see also Taxi Connection v. Dakota, Minn. & Eastern R.R. Corp.*, 513 F.3d 823, 826 (8th Cir. 2008) (stating that the court is not required to accept "mere conclusions" alleged in the complaint.).  "The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims . . . rather than facts that are merely consistent with such a right."  *Stalley ex rel. U.S. v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007) (citing *Twombly*, 127 S. Ct. at 1964-66).

**II.**

In 1993 Spindletop obtained a lease on an oil and gas well located in Section 4, Township 7 North, Range 13 West, Faulkner County, Arkansas, known as the "Sowash #1-4 Well" (hereinafter "Sowash Well"). In 2002, Spindletop was required to shut down its production of the Sowash Well due to conversion of its existing pipeline sales outlet to a distribution line. Prior to its shut-down, the Sowash Well was connected to a CenterPoint Energy collection line, and the oil and gas was then sold into the CenterPoint Energy line. In 2005, Chesapeake began executing oil and gas leases with various landowners, including those of the Sowash Well. Chesapeake's lease of the Sowash Well is known as a "top lease" because it does not become effective until the underlying lease, that is Spindletop's lease, is removed or voided.

Spindletop's second amended third party complaint alleges that Chesapeake owns a collection line approximately six-tenths of a mile from the Sowash Well and that Chesapeake's line is the nearest collection line to the Sowash Well. Spindletop alleges that the next nearest collection line is approximately six miles away, which means that Chesapeake's collection line is the only economically viable option for Spindletop.

Spindletop alleges that, beginning in 2008, it began negotiating with Chesapeake for the right to connect to Chesapeake's collection line and begin selling gas into their line. The third party complaint alleges that Chesapeake ceased negotiations at the end of 2008 when its gas purchasing department learned from its land department that Chesapeake had top leases on portions of the Sowash Well, that Spindletop's Sowash Well lease was pending before the Arkansas Oil and Gas Commission, and that cancellation of Spindletop's oil and gas lease on the Sowash Well would result in Chesapeake's top lease becoming effective. Because the Sowash Well had not been

3

producing for a period of two years, the Arkansas Oil and Gas Commission began temporary abandonment proceedings against Spindletop, seeking to require Spindletop to either produce oil and gas or plug the well. Spindletop alleges that at the final hearing on the temporary abandonment proceeding, the plaintiffs objected to the recommended settlement and asked the Arkansas Oil and Gas Commission to enter an order requiring Spindletop to produce from the Sowash Well or plug the well and lose its rights. Spindletop alleges that Chesapeake unreasonably and without cause denied Spindletop any access whatsoever to its collection line. Spindletop also alleges that Chesapeake collaborated with the plaintiffs to have the Arkansas Oil and Gas Commission force Spindletop to either produce from the Sowash Well or plug the well so that Chesapeake's top lease would become effective.

The second amended third party complaint attempts to allege claims for tortious interference with a business expectancy; tortious interference with a contract; civil conspiracy; unfair trade practices or monopoly in violation of Ark. Code Ann. § 4-75-201 *et seq.*, Ark. Code Ann. § 4-75-301 *et seq.*, and common law; and unfair conspiracy and monopoly under the Sherman Antitrust Act. It essentially alleges that Spindletop had a valid contract with the plaintiffs and a valid business expectancy in its Sowash Well lease; that Chesapeake unreasonably refused to allow Spindletop access to its collection line; and that Chesapeake collaborated with the plaintiffs to have the Arkansas Oil and Gas Commission enter an order requiring Spindletop either to produce from the Sowash Well or plug the well so that Chesapeake's top lease would become effective.

In its motion to dismiss the second amended third party complaint, Chesapeake argues that Spindletop has failed to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Chesapeake argues that it had no legal duty to provide Spindletop access to its collection line, and

thus that Spindletop has failed to allege facts sufficient to support its allegation that Chesapeake intentionally interfered with its business and contractual expectancies.  For the same reasons, Chesapeake argues that Spindletop has failed to allege facts sufficient to support its claim for civil conspiracy, namely that it is not unlawful, oppressive or immoral for Chesapeake to refuse to grant Spindletop access to its collection line, for Chesapeake to cease negotiations with Spindletop, or for Chesapeake to encourage the plaintiffs to attack the Sowash Well lease or provide financing for the plaintiffs' actions against Spindletop, even if those allegations are true.

Chesapeake also argues that Spindletop has failed to state a claim under Arkansas law prohibiting unfair trade practices and monopolies because the facts as alleged do not support the conclusion that Chesapeake engaged in price discrimination; secretly made payments or allowances to others to drive Spindletop out of business; offered its services at less than cost with the intent to injure Spindletop; or joined with others to pursue conduct or activity which is unlawful.  Regarding Spindletop's claims under the Sherman Antitrust Act, Chesapeake says that Spindletop's allegations are insufficient to constitute a monopoly or unfair restraint on trade under either a "*per se* violation" or "rule of reason" analysis.  Finally, Chesapeake argues that Spindletop's claims are barred by the applicable statute of limitations and should thus be dismissed.

In response, Spindletop argues that Chesapeake intentionally interfered with its business and contractual expectancies when Chesapeake abruptly ceased negotiations to allow Spindletop to use its collection lines as is customary in the oil and gas industry, thus negating Spindletop's ability to produce oil and gas from the Sowash Well.  Spindletop says that Chesapeake intentionally interfered with its business expectancy by entering into top leases with the plaintiffs and then assisting and inducing the plaintiffs to attack Spindletop's underlying leases.  Spindletop argues that Chesapeake's

actions in collaboration with the plaintiffs before the Arkansas Oil and Gas Commission were unlawful, oppressive or immoral.  Finally, regarding its Sherman Antitrust Act claims, Spindletop says that it has adequately alleged a *per se* violation of the Act, making a rule of reason analysis inappropriate.  Spindletop also argues that its claims are not barred by the applicable three year statute of limitations because the third party complaint alleges that Chesapeake acted to intentionally interfere with Spindletop's business and contractual expectancies in late 2008 and early 2009.

**III.**

A.    **TORTIOUS INTERFERENCE WITH BUSINESS OR CONTRACTUAL EXPECTANCY**

In order to state a claim for tortious interference with a business or contractual expectancy, a plaintiff must allege facts sufficient to prove: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.  *El Paso Production Co. v. Blanchard*, 371 Ark. 634, 647-48, 269 S.W.3d 362, 373 (2007).  In addition, the interference must be improper to be actionable.  *Id.* (citing *Stewart Title Guaranty Co. v. American Abstract & Title Co.*, 363 Ark. 530, 215 S.W.3d 596 (2005)).

The issue is whether Spindletop alleges facts sufficient to support the third element, that is, that Chesapeake improperly and intentionally interfered with Spindletop's business and contractual expectancies in the Sowash Well, thus causing a breach or termination of Spindletop's business expectancy and contractual relationship with the plaintiffs.  That issue turns on whether Chesapeake had a duty to allow Spindletop access to its collection lines.  Spindletop has provided no authority to support the proposition that Chesapeake had a legal duty to allow Spindletop access to its

collection lines or to continue negotiations with Spindletop regarding use of the collection lines.

Chesapeake's entering into a top lease is a routine and customary practice in the oil and gas industry,

as is negotiating shared use of a collection line between two competing oil and gas companies, but

Spindletop has presented no authority showing that Chesapeake had a legal duty to allow Spindletop

use of Chesapeake's collection lines or to continue negotiations with Spindletop over use of those

lines.  Although it may be customary for a competing oil and gas company to allow another company

to use its collection lines, nothing before the Court shows that such a customary business practice

arose to the level of a legal duty between Chesapeake and Spindletop.

**B.     CIVIL CONSPIRACY**

On its Spindletop's claim for civil conspiracy, Spindletop must allege facts sufficient to show

that "two or more persons have combined to accomplish a purpose that is unlawful or oppressive or

to accomplish some purpose, not in itself unlawful, oppressive or immoral, but by unlawful,

oppressive, or immoral means, to the injury of another."  *Allen v. Allison*, 356 Ark. 403, 413, 155

S.W.3d 682, 689 (2004) (citing *Faulkner v. Arkansas Children's Hosp.*, 347 Ark. 941, 69 S.W.3d

393 (2002)).  Spindletop may recover only for damages caused by acts committed pursuant to the

alleged conspiracy, and it must allege facts showing a specific intent to accomplish the contemplated

wrong.  *Id*.

In its third party complaint, Spindletop alleges that Chesapeake collaborated with the

plaintiffs with the intent of inducing the Arkansas Oil and Gas Commission to cancel Spindletop's

lease on the Sowash Well and that the means used by Chesapeake and the plaintiffs were unlawful,

oppressive, or immoral.  As with Spindletop's claim for tortious interference with business or

contractual expectancies, however, Spindletop's third party complaint fails to allege facts showing

that Chesapeake's actions, even if true, were illegal, immoral, improper, or oppressive.  The plaintiffs were acting on their legal right to seek cancellation of Spindletop's lease on the Sowash Well in front of the Arkansas Oil and Gas Commission.  *See, e.g., Sunbelt Exploration Co. v. Stephens Production Co.*, 320 Ark. 298, 304, 896 S.W.2d 867, 871 (1995) ("Cancellation of an oil and gas lease is an equitable remedy and is appropriate when a breach of the implied covenant of reasonable development is shown.").  Even if Chesapeake supported the plaintiffs in their claim before the Arkansas Oil and Gas Commission, financially or otherwise, Spindletop fails to show why the plaintiffs would not be entitled to seek cancellation of the Sowash Well lease, or why Chesapeake did not have a legal right to enter into a top lease for the Sowash Well and subsequently support the plaintiffs in seeking to cancel Spindletop's lease on the Sowash Well.  The cancellation of Spindletop's lease on the Sowash Well was due to Spindletop's inability to produce oil or gas from that well since 2002.  *See, e.g., Crystal Oil Co. v. Warmack*, 313 Ark. 381, 384, 855 S.W.2d 299, 301 (1993) (noting that, absent a provision to the contrary, there is an implied covenant to develop in any oil and gas lease).  Although Chesapeake could have allowed Spindletop to use its collection line, it chose not to do so and, so far as Spindletop has shown, had no legal duty to do so.  Although the plaintiffs could have chosen to allow Spindletop's lease on the Sowash Well to continue despite the lack of production, they chose not to do so and had no legal duty to do so.  Spindletop's claim for civil conspiracy cannot be supported by allegations that the plaintiffs and Chesapeake collaborated in pursuing their respective legal options.

## C.   UNFAIR TRADE PRACTICES OR MONOPOLY

Spindletop's claim for unfair trade practices or monopoly fails for the same reasons.  The third party complaint alleges that Chesapeake "unreasonably and without cause refused to allow

Spindletop to connect to its pipeline near the Sowash Well with the full knowledge that Spindletop cannot produce gas from the Sowash Well without a connection to a pipeline in which to transport the gas to market." However, as has been previously stated, Spindletop has presented no authority showing that Chesapeake had a legal duty to allow Spindletop to connect to Chesapeake's pipeline near the Sowash Well. Under Arkansas law, Chesapeake has a privilege to compete with other oil and gas companies, and the scope of that privilege is broad. *Office Machines, Inc. v. Mitchell*, 95 Ark. App. 128, 130, 234 S.W.3d 906, 908 (2006); *see also Kinco, Inc. v. Schueck Steel, Inc.*, 283 Ark. 72, 77-78, 671 S.W.2d 178, 181 (1984) ("[A] defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiation behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability.") (quoting W. Prosser, *Law of Torts* § 130 (3rd ed. 1971)). It is not enough for Spindletop to allege the conclusion that Chesapeake violated the various elements of the Arkansas Unfair Trade Practices Act or the common law on unfair trade practices. As with Spindletop's claims for interference with business and contractual expectancies and civil conspiracy, Spindletop has not alleged facts sufficient to show that Chesapeake's acquisition of top leases, collaboration with the plaintiffs, or refusal to allow Spindletop access to its collection lines constitute behavior that exceeds the scope of Chesapeake's privilege to compete with Spindletop.

## D.   SHERMAN ANTITRUST ACT

In its second amended third party complaint, Spindletop added claims for restraint of trade and monopoly under sections 1 and 2 of the Sherman Antitrust Act (the "Act"), 15 U.S.C. §§ 1 and 2. Spindletop seeks treble damages under 15 U.S.C. § 15. Sections 1 and 2 are directed to different

threats to competition.  On the one hand, § 1 addresses concerted actions: contracts, combinations, and conspiracies in restraint of trade.  On the other, § 2 addresses the unilateral conduct of monopolization.

Spindletop argues it has alleged a *per se* violation of § 1 by alleging a boycott or refusal to deal.  Practices that are illegal *per se* include price-fixing, division of markets, group boycotts, and tying arrangements.  *Double D Spotting Service, Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir. 1998).  Certain group boycotts or concerted refusals to deal with other traders "are so likely to restrict competition without any offsetting efficiency gains" that they constitute *per se* violations of the Act.  *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing*, 472 U.S. 284, 290, 105 S. Ct. 2613, 2617, 86 L. Ed. 2d 202 (1985); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S. Ct. 705, 709, 3 L. Ed. 2d 741 (1959).  A refusal to deal is a *per se* violation only when it results from an agreement between parties at the same market level to refuse to deal with another party.  *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135, 119 S. Ct. 493, 498, 142 L. Ed. 2d 510 (1998); *Verma v. Jefferson Hosp. Ass'n*, 2007 WL 4468689, at *6-7 (E.D. Ark. Dec. 17, 2007).

Spindletop alleges that Chesapeake and the individual landowners conspired to have Chesapeake refuse to grant Spindletop access to the collection pipeline nearest to the Sowash well. Chesapeake and the landowners, however, are not direct competitors and are not at the same market level.  The landowners own land that contains oil and gas reserves, and they lease to others the right to drill for and extract the oil and natural gas.  Chesapeake does not own the land.  It has merely acquired an oil and gas lease on the Sowash well that became effective when Spindletop's lease was voided. Chesapeake and Spindletop are direct competitors at the same market level; Chesapeake and

the landowners are not.  Therefore, an agreement between Chesapeake and the landowners as described in the third party complaint does not constitute a *per se* violation of § 1.

Because no *per se* violation is alleged, Spindletop's § 1 claim must be analyzed under the rule of reason, according to which the finder of fact must determine whether the challenged practice imposes an unreasonable restraint on trade.  *Double D Spotting Service, Inc. v. Supervalu, Inc.*, 136 F.3d at 558.  The rule of reason analysis requires an inquiry into the market structure and the defendants' market power to assess the actual effect on competition.  *Id.*  Spindletop must plead and prove a valid relevant market on both the § 1 and the § 2 claims.  *Double D*, 136 F.3d at 560; *Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc.*, 531 F.2d 910, 918 (8th Cir. 1976); *Cannon v. Elk Horn Bank and Trust*, 258 F. Supp. 2d 908, 913 (W.D. Ark. 2002).  As will be explained *infra*, Spindletop has not alleged a valid relevant market.

Count Five alleges that Chesapeake has refused to allow Spindletop to connect to its pipeline and has entered into an agreement with the landowners "to freeze out Spindletop from the Arkansas oil and gas market," in violation of section 1 of the Sherman Act.  Count Six of the third party complaint alleges that Chesapeake willfully acquired and misused monopoly power over "the oil and gas market in Arkansas and in surrounding states" and that Chesapeake conspired with the landowners to monopolize that market in violation of section 2 of the Sherman Act.

Section 2 makes it illegal for a person to monopolize, attempt to monopolize, or conspire with another person or persons to monopolize any part of trade or commerce.  15 U.S.C. § 2.  "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business

acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S. Ct. 1698, 1704, 16 L. Ed. 2d 778 (1966). "The first element, monopoly power, is the power to control prices in or to exclude competition from the relevant market." *Morris Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S. Ct. 994, 1005, 100 L. Ed. 1264 (1956)). The second element involves predatory or exclusionary acts or practices that prevent or exclude competition within the relevant market. *Id*; *see also Trace X Chemical, Inc. v. Canadian Industries, Ltd.*, 738 F.2d 261, 265 (8th Cir. 1984).

Defining a relevant market includes two components – a relevant product market and a relevant geographic market. *Bathke v. Casey's General Stores, Inc.*, 64 F.3d 340, 3345 (8th Cir. 1995). The geographic market "includes the geographic area in which consumers can practically seek alternative sources of the product, and it can be defined as 'the market area in which the seller operates.'" *Double D*, 136 F.3d at 560 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S. Ct. 623, 628, 5 L. Ed. 2d 580 (1961)). The relevant geographic market is also generally defined as the "geographic area of effective competition in which the product is traded." *Princess House, Inc. v. Lindsey*, 918 F. Supp. 1356, 1371 (W.D. Mo. 1994) (citing *Standard Oil Co. v. United States*, 337 U.S. 293, 299 N.5, 69 S. Ct. 1051, 1055 N.5, 93 L. Ed. 1371 (1949)). The geographic market must be economically significant and correspond to the commercial realities of the industry being considered. *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37, 82 S. Ct. 1502, 1530, 8 L. Ed. 2d 510 (1962). "A geographic market is determined not by where consumers *actually* go for a particular product or service, but rather by where they *could* go should the defendants' prices become anticompetitive." *Ferguson Med. Group, L.P. v. Missouri Delta Med.*

*Ctr.*, 2006 WL 2225454, at *2 (E.D. Mo. Aug. 2, 2006).  The burden of establishing that a specified area constitutes a relevant geographic market in a particular case rests with the plaintiff. *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir. 1994).  Although this is normally a factual inquiry, courts have not hesitated to dismiss antitrust claims where it is clear that the alleged geographic market is too narrow or implausible.  *Ferguson*, 2006 WL 2225454 at *3.

Spindletop's § 1 claim alleges that Chesapeake has acted "to freeze Spindletop out of the Arkansas oil and gas market" (¶65).  Its § 2 claim alleges that Chesapeake has a monopoly "on the oil and gas market in Arkansas and in surrounding states" (¶¶ 69-70).  It is impossible to determine from these allegations what the alleged geographical market is.  On the one hand, the complaint alleges that Arkansas is the relevant geographical market; and, on the other, it alleges that Arkansas and unspecified surrounding states are the geographical market.

On the face of the complaint, it seems implausible that the relevant geographic market for oil is coextensive with the boundaries of the state of Arkansas.  Where an alleged geographic market seems implausible, a more detailed pleading to justify the alleged geographic market may be required to survive a motion to dismiss.  *See* IIB PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 531f (3d ed. 2007).  Spindletop alleges nothing to support the notion that the State of Arkansas, or the State of Arkansas and "surrounding states," is a valid relevant market.

Even if Arkansas was a plausible geographic market for oil and gas produced from Arkansas wells, Spindletop's inconsistent characterization of the geographic market would require dismissal of the third party complaint.  *See E.I. duPont de Nemours and Co. v. Kolon Industries, Inc.*, 2009 WL 2762614, at *11 (E.D. Va. Aug. 27, 2009) (stating the motion to dismiss was well-taken where allegations of relevant geographical market were conclusory and internally inconsistent).  "Arkansas

and other surrounding states" encompasses a greater geographic territory than just the state of Arkansas, but it is impossible to know how much greater. The third party complaint fails to allege in which surrounding states Chesapeake holds a monopoly, or how it is that Chesapeake's alleged monopoly is limited to Arkansas and those particular surrounding states, as opposed to all other states in the nation. Spindletop fails to plead a relevant geographic market, which means that it fails to state a claim upon which relief can be granted under section 1 or section 2 of the Sherman Act.

Although the complaint does not use the exact phrase, Spindletop's complaint might be read to allege that Chesapeake's actions have deprived Spindletop of access to an "essential facility." Under the "essential facilities" doctrine, those in possession of facilities which cannot practically be duplicated must share those facilities with their competitors. *Willman v. Heartland Hosp. East*, 34 F.3d 605, 612-13 (8th Cir. 1994); *see generally* IIIB PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶¶ 771-774 (3d ed. 2007).[1] "[T]he essential facilities doctrine and other cases

---

[1]Areeda and Hovenkamp discuss the impact of judicial intervention in situations similar to this one:

> For example, suppose the claimed essential facility is a natural gas line, and the defendant both owns the line and sells gas to customers at the end of the line. The plaintiff sells only gas and wishes to share the defendant's line. The plaintiff may claim (a) that the defendant's refusal to share the line is a denial of an essential facility; or (b) that denial of access to the gas line monopoly "leverages" a second monopoly in the gas itself.

> But the gas pipeline monopoly enables the defendant to obtain all available monopoly profits from sales of the gas, into which the line is an essential input. As a result, the market will be just as monopolized after the defendant shares with the plaintiff as it was before. The only way the courts can address the problem is by regulating prices as well as access.

> * * *

> Suppose a natural gas producer claims that the defendant's pipeline is an "essential facility." A court responds by (a) mandating that the defendant share its pipeline, and (b) ordering the defendant to charge only "reasonable," or competitive, prices for

holding monopolists liable for refusing to deal only qualify the general rule that there is no duty to help competitors." *Florida Fuels, Inc. v. Belcher Oil Co.*, 717 F. Supp. 1528, 1532 (S.D. Fla. 1989) (citing *Olympia Equipment Leasing v. Western Union Tel.*, 797 F.2d 370, 376 (7th Cir. 1986)). Spindletop's complaint could be read as alleging that Chesapeake's collection line near the Sowash Well is an essential facility, necessary for Spindletop to transport extracted gas and oil to consumers in the marketplace.

Even if Spindletop's complaint can be read as making a claim under the essential facilities doctrine, it still fails. To prevail under the doctrine, a plaintiff must establish (1) control of an essential facility by a monopolist; (2) the inability to practically or economically duplicate the facility; and (3) the unreasonable denial of the use of the facility to a competitor when such use is economically and technically feasible." *Willman*, 34 F.3d at 613 (quoting *City of Malden, Mo. v.*

---

access. At that point the plaintiff has no incentive to develop another pipeline or perhaps other technology for transporting gas. It already has a right to access at the competitive price and almost certainly could not do better on its own. The result is that the market remains a monopoly, albeit with judicially administered prices.

Further, if an unduly broad decree or principles of offensive collateral estoppel require the defendant to share the pipeline with other gas firms as well, then *no one* any longer has the incentive to develop alternatives to the defendant's pipeline. In that case antitrust has effectively preserved the monopoly and turned it into a price-regulated public utility.

By contrast, if the court orders access but does not insist on the competitive price, then at least some of the incentive to look for alternatives remains. In this case, the plaintiff has acquired market access but only at monopoly prices. The degree of its incentive to develop an alternative pipeline will be driven mainly by how much of the monopoly price for the pipeline is absorbed and how much is "passed on" to its customers. In the usual case, a significant amount of such a monopoly overcharge is passed on. To that extent the plaintiff's incentive to build an alternative pipeline is significantly reduced as well.

IIIB PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶¶ 773d, 774e, at 251-52, 267 (3d ed. 2007).

*Union Elec. Co.*, 887 F.2d 157, 160 (8th Cir. 1989)); *see also MCI Communications Corp. v. Am. Tel. and Tel. Co.*, 708 F.2d 1081, 1132-33 (7th Cir. 1983) (collecting cases); *Florida Fuels, Inc.*, 717 F. Supp. at 1532.   Here, Spindletop has failed to state facts sufficient to support the claim that Chesapeake possessed monopoly power within a relevant geographic market, which is essential to the first element of the "essential facilities" doctrine.  *See State of Ill. ex rel. Hartigan v. Panhandle Eastern Pipe Line Co.*, 730 F. Supp. 826, 870, 927 (C.D. Ill. 1990) (where defendant's pipeline system consisted of a series of local geographic markets representing concentration of demand along a pipeline, defendant possessed monopoly power within a relevant market, but other available pipelines made access to defendant's pipeline unnecessary).   Where even one element is absent, an argument under the essential facilities doctrine is unavailing.  *See McKenzie v. Mercy Hosp. of Independence, Kan.*, 854 F.2d 365, 370 (10th Cir. 1988) (overruled on other grounds).  Because Spindletop has not alleged facts sufficient to support a claim that Chesapeake was a monopolist in control of an essential facility, its antitrust claims fail.

## CONCLUSION

For the foregoing reasons, Spindletop's claims against Chesapeake are dismissed without prejudice for failure to state a claim.  Chesapeake's motion to dismiss the third party complaint is GRANTED.  Documents #5 and #16.

IT IS SO ORDERED this 18th day of November, 2009.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE